**In re: AIR SOUTH AIRLINES, INC. Debtor.**

**W. Ryan Hovis, Trustee, Plaintiff,**

v.

**Aerospace Solutions, Inc., Defendant.**

**Bankruptcy No. 97–07229–W. Adversary No. 99–80256–W.**

United States Bankruptcy Court, D. South Carolina.

Jan. 14, 2000.

Robert F. Anderson, Columbia, SC, for Plaintiff.

Gina L. Campano, Columbia, SC, for Defendant.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon Aerospace Solutions, Inc.'s ("ASI" or "Defendant") Motion for Summary Judgment ("Motion") pursuant to Bankruptcy Rule 7056. After reviewing the pleadings in this matter and considering the evidence presented and arguments of counsels for the parties, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

### FINDINGS OF FACT

1. Air South Airlines, Inc. ("Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 28, 1997. The case was subsequently converted to Chapter 7 and Plaintiff was appointed to act as Trustee.

2. On July 14, 1999, Plaintiff commenced this adversary proceeding seeking the avoidance of transfers in the amount of $21,350.00 pursuant to 11 U.S.C. § 547(b)[2] and S.C.Code § 27–25–10. ASI answered timely on September 15, 1999.

3. ASI is a corporation authorized to conduct business in South Carolina, and it engages in the sale of aircraft parts.

4. Debtor placed orders for goods with ASI and paid ASI's invoices as follows:

| Invoice/ Shipment Date | Invoice No. | Date of Check | Date Check Received | Amount |
|---|---|---|---|---|
| 02/19/97 | 7000 | 02/21/97 | N/A | $11,000 |
| 02/28/97 | 7048 | 02/25/97 | N/A | $ 8,500 |
| 05/23/97 | 9167 | 06/26/97 | 06/27/97 | $ 4,000 |
| 06/07/97 | 9205 | 06/12/97 | 06/16/97 | $ 9,050 |
| 07/01/97 | 9256 | 08/15/97 | 08/25/97 | $ 2,500 |
| 08/08/97 | 9369 | 08/11/97 | 08/18/97 | $ 5,800 |

5. The preference period began ninety days prior to the filing of the voluntary Chapter 11 petition. The Trustee seeks the recovery of the four payments which were made between June 27, 1997 and August 18, 1997. The first two transactions, constituting payments of $11,000 and $8,500 respectively, took place outside the preference period.

6. ASI's common business practice with its customers was that the first order submitted by a new customer was subject to payment on a "C.O.D." basis. Thereafter, once references were checked, all orders that did not exceed $5,000 in value were subject to "Net 30" payment terms, pursuant to which the customer was to pay within 30 days. For orders in excess of $5,000, the payment terms were on "C.O.D." or "in advance" basis.

7. The payment terms for the four transactions in question were as follows:

| Invoice Shipment Date | Invoice Number | Amount | Payment Terms |
|---|---|---|---|
| 05/23/97 | 9167 | $4,000 | Net 30 |
| 06/07/97 | 9205 | $9,050 | Check Overnight |
| 07/01/97 | 9256 | $2,500 | Net 30 |
| 08/08/97 | 9369 | $5,800 | Upon receipt |

8. The average length of time a trade debt remained outstanding in the airline industry in 1997 was in the range of thirty-five to forty days.

### CONCLUSIONS OF LAW

#### 1. Standard for Summary Judgment

ASI has requested summary judgment on the grounds that the payments were made in the ordinary course of business pursuant to § 547(c)(2). Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings under the Bankruptcy Code by Bankruptcy Rule 7056, provides that a party may move for summary judgment, and that such judgment "shall be rendered forthwith" if the evidence and pleadings "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

---

[1] The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such; and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

[2] Further references to the Bankruptcy Code shall be by section number only.

R.Civ.P. 56(c). When determining whether summary judgment should be granted, the court "does not try factual issues; rather, it determines whether there are any fact issues to be tried." *Dunes Hotel Assoc. v. Hyatt Corp. (In re Dunes Hotel Assoc.)*, 194 B.R. 967, 976 (Bankr.D.S.C. 1995).

In order to prevail on a motion for summary judgment, the movant must show by means of pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment shall be granted, "against a party who fails to make a showing sufficient to establish the evidence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Dunes Hotel Assoc.*, 194 B.R. at 976 (citing *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548). After the movant has proved the absence of any genuine issue of material fact, "the burden of proof shifts and the party opposing summary judgment may not merely rely on his pleading but must set forth specific facts which controvert the moving party's facts and which show the existence of a genuine issue for trial." *Id.*

## 2. Preferential Transfers

Section 547(b) provides the trustee with the authority to avoid any pre-petition transfer which meets the requirements outlined in the section. Pursuant to § 547(g), the trustee bears the burden to prove all the requirements set forth in § 547(b). More particularly, § 547(b) provides in pertinent part:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ The avoidance power that trustees have pursuant to § 547(b) promotes equal distribution of the bankruptcy estate among the creditors by ensuring that all of those within the same class receive the same pro-rata share of the bankruptcy estate, while discouraging creditors "from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor." *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir.1994). There is no dispute that the transfers in this case fall within § 547(b)'s definition of preferential transfer;[3] rather, the dispute

---

**3.** All the requirements of § 547(b) are met in this case. First, the transfer in question were payments by Debtor for the benefit of ASI, a creditor. Second, the payments were on account of antecedent debts incurred when ASI shipped the goods to Debtor. Third, pursuant to § 547(f), "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Fourth, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 28, 1997; thus, the four transfers at issue in this case were all made within the 90 days prior to the date of

in this case revolves around the applicability of the "ordinary course of business" exception set forth in § 547(c)(2).

Although certain transfers may fall within the requirements of § 547(b), the Bankruptcy Code provides several defenses to a preferential transfer recovery. One of those defenses, known as the "ordinary business defense," permits a transferee to prevent the trustee's avoidance of preferential transfers by satisfying the three requirements set forth in § 547(c)(2):

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.

■ Preferential transfer law is designed to disturb only unusual debtor-creditor relationships which "disrupt the paramount bankruptcy policy of the equitable treatment of creditors." *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 223 (3d Cir.1994). The ordinary business exception to preferential transfers "benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor." *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996); *see also In re Molded Acoustical Products, Inc.*, 18 F.3d at 224; *Energy*

*Coop. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1004 (7th Cir. 1987) (section 547(c)(2) was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary business of the Debtor and the transferee.").

■ In order to prevail under the ordinary course of business defense in this case, ASI bears the burden of proving that the debts, as represented by the invoices, were incurred in the ordinary course of the business affairs of Debtor and ASI; the payments were made in the ordinary course of the business of Debtor and ASI; and the transfers were in harmony with the range of terms prevailing in the relevant industry's norms. *See* § 547(g) ("[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section."); *see, e.g. Campbell v. NationsBank (In re Rodwell Pontiac Cadillac GMC Truck, Inc.)*, 93–71381–W; 95–8003–W (Bankr. D.S.C.03/25/1996). The parties acknowledge that the debts were incurred in the ordinary course of the parties' business; thus, subsection A of § 547(c)(2) is satisfied. The issues that remain before this Court are whether ASI has met its burden under subsections B and C so that summary judgment may be granted in its favor.

### 3. Date of Transfer

■ The first issue to be determined by the Court is the time a transfer is deemed to have occurred for purposes of § 547(c) when payment is by check. Whereas for purposes of § 547(b), courts have held that transfers of funds by check are effective when the drawee bank honors the check, a payment by check is deemed to be effective for purposes of § 547(c) when the

the filing, as required by § 547(b)(4)(A). Lastly, the transfers enabled ASI to receive more than it would receive in a Chapter 7 proceeding. ASI was an unsecured creditor

and, because in this case unsecured creditors will receive less than 100% distribution, ASI's position was improved by virtue of receiving the payments.

check is received by the creditor. *See Durham v. Smith Metal & Iron Co. (In re Continental Commodities, Inc.)*, 841 F.2d 527, 528 (4th Cir.1988) ("[F]or purpose of section 547(c)(2)(B) of the Bankruptcy Code of 1978, a transfer of funds by check is effective on the date that the creditor receives the check as long as the debtor's bank honors it within 30–day requirement of U.C.C. § 3–503(2).");[4] *see also Barnhill v. Johnson*, 503 U.S. 393, 402 n. 9, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)[5]; *Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 807 (5th Cir.1989). The construction that courts have given to the date of transfer when payments by check are in question is consistent with the legislative history of § 547(c). When discussing the application of §§ 547(c)(1) and (2), the legislature noted: "Payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for the purpose of sections 547(c)(1) and (2)." *Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d at 807 (citing 124 Cong. Re. § 17414 (daily ed. Oct. 6, 1978) (Statement of Sen. De Concini); 124 Cong. Rec.H. 11097 (daily ed. Sept. 28, 1978) (Statement of Rep. Don Edwards)).

Therefore, this Court concludes that when applying the affirmative defense set forth in § 547(c)(2), the date of "transfer" is determined to be when the check is received by the creditor, not the date the check is honored by the drawee bank.

**4. Section 547(c)(2)–The Ordinary Course of Business Defense**

In order to prevail with the affirmative defense of "ordinary course of business," the creditor has the burden to prove that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee" and that the transfer was "made according to ordinary business terms." Subsections (B) and (C) provide a subjective and objective test respectively which require the Court to engage in separate analyses. *See Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir.1994) ("Because subsections B and C are written in the conjunctive, the use of subsection B's sub-

---

**4.** Prior to the 1984 amendments to the Bankruptcy Code, § 547(c)(2)(B) provided that the trustee could not avoid a transfer "(B) made not later than 45 days after such debt was incurred." The 45–day requirement was eliminated because "it unduly burdened creditors receiving payments under billing cycles greater than 45 days" by exempting them from § 547(c), *In re Continental Commodities, Inc.*, 841 F.2d at 528 n. 1; however, the holding of *In re Continental Commodities, Inc.* is still good law, and it is the general understanding among courts that the date of delivery of a check constitutes the date of the "transfer" when the affirmative defenses set forth in § 547(c) are in question. *See, e.g., Rushton v. E & S Int'l Enter. (In re Eleva, Inc.)*, 235 B.R. 486, 488 (10th Cir. BAP 1999); *Brandt v. Sprint Corp. (In re Sonicraft, Inc.)*, 238 B.R. 409, 415 (Bankr.N.D.Ill.1999); *Schilling v. Jackson Oil Co. (In re Transport Assoc., Inc.)*, 171 B.R. 232, 234–35 (Bankr. W.D.Ky.1994); *Young v. Continental Worsteds, Inc. (In re Wingspread Corp.)*, 120 B.R. 8, 10 (Bankr.S.D.N.Y.1990).

**5.** The Supreme Court in *Barnhill v. Johnson*, which held that for purposes of § 547(b) a transfer made by check is deemed to occur when the drawee bank honors the check, left unanswered the issue of when a "transfer" occurs for purposes of § 547(c). The Supreme Court, in fact, pointed out in a footnote that "[w]e, of course, express no views on that issue, which is not properly before us." *Id.* at 402 n. 9, 112 S.Ct. 1386. The Court indicated that § 547(c)(2) underwent substantial changes following the 1984 amendments and further noted that "[t]his in turn may mean that, in the context of a check payment, there is now less need to precisely date the time when a check transfer occurs for purposes of § 547(c)(2)." However, the date on which the "transfer" occurred in this case is important because it has an impact on whether the subject transfers occurred according to the ordinary business terms of the airline industry. Furthermore, after the decision in *Barnhill*, courts continued to hold that for purposes of § 547(c)(2), a "transfer" involving a check was deemed to be made when the check was delivered to the creditor. *See, e.g., Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.)*, 193 B.R. 204, 212 (Bankr.D.Md.1996).

jective approach under subsection C would render subsection C superfluous. We refuse to say that Congress wrote a separate subsection for no reason at all.").

The Code fails to define the phrases "ordinary course of business" and "ordinary business terms;" thus, the inquiry is "particularly factual." *See In re First Software Corp.*, 81 B.R. 211, 213 (Bankr. D.Mass.1988); *see also Yurika Foods Corp. v. UPS (In re Yurika Food Corp.)*, 888 F.2d 42, 45 (6th Cir.1989) (citing *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989)) ("Whether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination which should not be set aside unless clearly erroneous."); *Trinkoff v. Porters Supply Co., Inc. (In re Daedalean, Inc.)*, 193 B.R. 204, 211 (Bankr.D.Md.1996) (quoting *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991)) ("However 'there is no precise legal test which can be applied' in determining whether payments by the Debtor during the ninety day preference period were 'made in the ordinary course of business'; 'rather, th[e] court must engage in a "peculiarly factual" analysis.' ").

### a. Subjective Test–Section 547(c)(2)(B)

■ Subsection B is the subjective component of the three-pronged test set forth in § 547(c) and involves the analysis of " 'the business practices which were unique to the particular parties under consideration.' " *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 736 (Bankr.W.D.Va.1995) (quoting *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir.1990)); *see also Logan v. Basic Distrib. Corp. (In re Fred Hawes Org.)*, 957 F.2d 239, 244 (6th Cir.1992) ("The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor."). This inquiry is done on a case-by-case basis; and, in so doing, the factors that the courts consider in determining whether the preferential transfers at issue were made in the ordinary course of the parties' business include: "1) the prior course of dealing between the parties; 2) the amount of the payments; 3) the timing of the payments; and 4) the circumstances surrounding the payments." *See Levy v. Gatlin (In re Gardner Matthews Plantation Co.)*, 118 B.R. 384, 385 (Bankr.D.S.C. 1989); *see also Campbell v. NationsBank (In re Rodwell Pontiac Cadillac GMC Truck, Inc.)*, C/A No. 93–71381–W; Adv. pro. No. 95–8003–W (Bankr.D.S.C.03–25–1996); *aff'd* C/A 2:96–1172–18 (D.S.C.11/27/1996). Late payments may be categorized as "ordinary" if late payments constituted the usual course of dealings between the parties. *See In re Fred Hawes Org.*, 957 F.2d at 244; *see also In re Yurika Foods Corp.*, 888 F.2d at 45.

■ In the case now before this Court, the parties were involved in only two transactions prior to the preference period. The Trustee argues that, while the two payments made prior to the preference period were made in a timely manner, the preferential payments were not made pursuant to the terms of the invoices and were late. The pre-preference transfers were for invoice numbers 7000 and 7048. Invoice number 7000 was dated Wednesday, February 19, 1997. According to the invoice, Debtor was required to make the payment by "overnight check;" however, Debtor waited until Friday, February 21, 1997 to write a check to satisfy the full balance of the invoice. The second pre-preferential payment was for invoice number 7048, which was dated Friday, February 28, 1997. The invoice specified that the payment was on a "C.O.D." basis. Debtor wrote a check for this invoice in advance; in fact, the check was dated Tuesday, February 25, 1997. The only two preference transfers that were on similar payment terms were invoice number 9205 and 9369 which were to be paid on a "check overnight" and "upon receipt" basis respectively; the other two transfers that

took place during the preference period were on a "Net 30" payment term. Whereas there is no prior history between the parties of transactions with payment terms of "Net 30," the limited history of transactions between the parties may be deemed to be some indication of a course of dealing between ASI and Debtor for payments on a "C.O.D." or "overnight check" basis. Therefore, whether invoice numbers 9205 and 9369 fall within the ordinary course of business, may be determined by comparing those transfers to the pre-preference transactions that were on the same payment terms.

The Trustee argues that the two payments made prior to the preference period were made in a timely manner. The Trustee notes that for invoice number 7000, Debtor made payment two days after the shipment/invoice date and for invoice number 7048, Debtor paid earlier than required by the invoice terms. Furthermore, the Trustee argues that the preferential payments for invoice number 9025 and 9369 were nine and ten days after the invoice respectively. As for invoice number 9025, the invoice/shipment date was Saturday, June 7, 1997 and the invoice specified that the goods were to be paid by "check overnight." Debtor wrote a check on Thursday, June 12, 1997, which was then received by ASI on Monday, June 16, 1997. As for invoice number 9369, the invoice/shipment date was Friday, August 8, 1997. Debtor wrote a check to satisfy the balance of the invoice on Monday, August 11, 1997. The check was not received by ASI until a week later, on Monday, August 18, 1997. The Trustee further argues that, the preferential payments being challenged were not made consistently with the short prior relationship between the parties.

The Court does not agree with the Trustee' reasoning. First, when considering the pre-preference established course of dealing between ASI and Debtor, the Trustee takes into account the date the checks were written, not the date they were received by ASI. There is no evidence before this Court of the date the pre-preference checks were received by the creditor; however, it can be assumed that, when taking into consideration the date the check was received by ASI as the date of transfer, there was a longer delay in payments than the Trustee argues. Furthermore, the invoices and shipment for the preferential transfers were sent on weekend days. In fact, the invoice/shipment dates for invoice number 9025 and 9369 fell on Saturday and Friday respectively. This may have further caused a slightly longer delay in the actual processing of the invoice and payment of the check by Debtor.

■ As the Court in *Huffman v. New Jersey Steel Corp.* has held, in analyzing subsection B, "a narrow band of difference is acceptable." *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.),* 182 B.R. 728, 737 (Bankr.W.D.Va.1995). The court in *Huffman* rejected the bright line rule set by the court in *Gold Coast Seed Co v. Beachner Seed Co. (Matter of Gold Coast Seed Co.)* which held that a payment made six days after the deadline set on the invoice was *per se* out of the ordinary course of business. *Gold Coast Seed Co. v. Beachner Seed Co. (Matter of Gold Coast seed Co.),* 24 B.R. 595, 597 (9th Cir. BAP 1982). As the court in *Huffman* concluded, the difference in the times of payments in the case now before this Court is "not so significant as to defeat the ordinariness of all the payments." *Huffman,* 182 B.R. at 736. Therefore, the Court concludes that the transfers Debtor made to ASI to satisfy invoice numbers 9205 and 9369 met the requirements of subsection B.

■ The remaining two preferential transfers that the Trustee seeks to recover were for invoices that set the payment terms as "Net 30." ASI and Debtor had never, prior to those two transfers, entered into transactions on similar payment terms; thus, there is no prior course of dealings between the parties on such terms. Where the debtor and the creditor

do not share a pre-preference course of dealing, some courts have held that the ordinary course of business exception cannot be used as an affirmative defense. *See e.g., Miller v. Kibler (In re Winters),* 182 B.R. 26, 29 (Bankr.E.D.Ky.1995) ("It is clear that § 547(c)(2) applies if the debtor and the transferee have an ongoing, 'recurring' business relationships. It does not apply to single, isolated transactions such as the one between the debtor and the defendants herein."); *Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload),* 152 B.R. 690, 691 (Bankr.N.D.Ga.1992) ("If there is no prior course of dealings between the parties, the transferee cannot satisfy [§ 547(c)(2)(B) ], and the transfer may be avoided."). As the court in *Gosch v. Burns (In re Finn)* concluded, "[o]bviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time." *In re Finn,* 909 F.2d 903, 908 (6th Cir.1990). This Court holds that, as a general rule, a transaction between parties may be deemed to be in the "ordinary course of business or financial affairs" of the parties even if there is no prior history of dealings and the transaction is the first to take place between the creditor and the debtor. *Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.),* 92 B.R. 737 (W.D.Mich.1988) ("[T]his Court is not convinced that § (B) requires a history of prior dealings as a sine qua non in order to afford a transferee the protections of § 547(c)(2)."); *see also Tomlins v. BRW Paper Co. (In re Tulsa Litho, Co.),* 229 B.R. 806, 808 (10th Cir. BAP 1999).

█ The next issue to be resolved is what indicia courts may consider in determining whether the transaction took place in the "ordinary course of business."

Courts in various jurisdictions have come up with different views on the issue.

When there are no prior transactions with which to compare, the court may analyze other indicia, including whether the transaction is out of the ordinary for a person in the debtor's position, *In re Finn,* 909 F.2d 903, or whether the debtor complied with the terms of the contractual arrangement, *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1021 (10th Cir. BAP 1998), generally looking to the conduct of the parties, *see Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.),* 92 B.R. 737, 741 (W.D.Mich.1988), or to the parties' ordinary course of dealing in other business transactions, *Riske v. C.T.S. Systems, Inc. (In re Keller Tool Corp.),* 151 B.R. 912, 914 (Bankr.E.D.Mo.1993).

*Meeks v. Harrah's Tunica Corp (In re Armstrong),* 231 B.R. 723, 731 (Bankr. E.D.Ark.1999). This Court adopts the view set forth in *In re Morren Meat & Poultry Co.* and holds that the preprinted terms in the invoices that ASI sent to Debtor do not definitely define the ordinary course of business between the parties; rather, the Court considers the conduct of parties to determine whether any unusual conduct took place which would require the Court to set the subject transactions aside as preferential transfers.[6]

In *In re Morren Meat & Poultry,* Morren purchased meat from ASC only once, and the order totaled $41,580. The preprinted invoice set forth the terms of the order as follows: "TERMS—NET CASH 7 DAYS ... A service charge of 1/5% per month may be computed on all balances outstanding over 30 days. Annual percentage rate 18%." ASC received one check for half the amount of the invoice 31

---

6. The court in *In re Tulsa Litho* also concluded that "it is what is normal between the two parties that controls, not necessarily the printed words of an invoice." *In re Tulsa Litho, Co.,* 229 B.R. at 810. Tulsa Litho was acquired by a larger company prior to the preference period. The acquiring company had previously done business with the creditor, BRW. The court did not look at the preprinted terms of the invoices, rather, it considered the evidence before it which showed that the debtor paid the creditor in a manner similar to the parent company's payment practices.

days after the invoice date and 27 days after receipt of the goods. A second check for the remaining balance was received 40 days after the date of the invoice and 36 days after delivery of the goods. The court found no evidence that ASC demanded payment within seven days or attempted to collect service charges as indicated by the terms on the invoice and concluded that the transfers fell within the ordinary business exception. The Court recognized that the parties had not established a course of dealing among themselves given the fact that the transfer in question was the only transaction entered into among the debtor and creditor; however, the court took into consideration the two check payments, even though they were the only dealings and took place within the preference period, and concluded that

> [T]his Court is not convinced that here, in the case of an isolated transaction preprinted terms on a[sic] invoice definitively define the ordinary course of business for purposes of § 547(c)(2).

While the ordinary course of business remains undefined, this Court notes the absence in these two transfers of any indicia suggesting unusual conduct between Morren and ASC removing the transfer out of the ordinary course of business. The transfers were simply payments on an open book account with no unusual attempts at collecting on the debt.

*Id.* at 741.

As discussed above, the general purpose of § 547(b) is to discourage creditors from engaging in unusual collection activities and to prevent unusual payment activities by debtors; and to allow the Trustee, in turn, to avoid those unusual transfers for the benefit of the estate. *See, e.g. Styler v. Landmark Petroleum, Inc.,* 197 B.R. 919, 927 (D.Utah 1996). Section 547(c)'s affirmative defenses allow the debtor to continue normal relationships with creditors to allow the debtor " 'to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of

bankruptcy.' " *Id.* (quoting *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products),* 18 F.3d 217, 224 (3d Cir.1994)). The Court finds that the only invoice that presents unusual conduct between ASI and Debtor is invoice number 9256. Debtor's check for that invoice was not received until after fifty-five days of the invoice/shipment date. Thus, the Court finds that invoices number 9167, 9205, and 9369 all pass the "ordinary course of·business" test set forth in subsection B; while invoice 9256 does not.

**b. Objective Test–Section 547(c)(2)(C)**

Subsection C says that payments must be "made according to ordinary business terms" in order to meet the affirmative defense. Courts have viewed this subsection as the objective analysis of the three-pronged test, and have held that "the benchmark for ordinariness is the norm in the creditor's industry." *See Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1047 (4th Cir.1994); *Fiber Lite Corp v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 224 (3d Cir.1994) (quoting *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark.),* 9 F.3d 680, 685 (8th Cir.1993)) (" 'Ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C."). The authority in the Fourth Circuit on this subsection is *AdvoSystem, Inc. v. Maxway Corp.,* 37 F.3d 1044 (4th Cir.1994) in which the court held that "subsection C requires [the court] to look to the norm in the creditor's industry when determining whether preference payments were made according to ordinary business terms." *Id.* at 1048. The extent to which a transaction between the creditor and the debtor

may vary from the established industry norm depends on the length of time of the relationship between the parties.

> In summary, we hold that subsection C requires an objective analysis and we adopt the Seventh Circuit's Tolona Pizza rule modified and embellished as follows by the Third Circuit in Molded Acoustical.

>> [W]e read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.

*Id.* at 1050 (quoting *In re Molded Acoustical Products, Inc.),* 18 F.3d at 226. Thus, when the relationship between the parties has been firmly established, courts are more lenient in analyzing subsection C and allow a greater deviation from the industry norms, however

> When the relationship between the parties is of recent origin, or formed only

after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry. That is because in that class of cases we lack something better to look at to verify that the creditor is not exploiting the debtor's precarious position at the brink of bankruptcy so that it may advantage itself to the detriment of other creditors who continue to extend credit within the letter and spirit of the Code . . . .

*In re Molded Acoustical Products, Inc.,* 18 F.3d at 225–26.

■ Because the history of transactions between ASI and Debtor is very recent, the Court has engaged in a "rigorous comparison" between the transactions in question and the terms used generally in the relevant industry. The Court finds that the relevant industry to consider in this case is the airline industry. In this case, Defendant relies upon evidence obtained from Trustee's professional. Robert E. Faulkner[7] stated in his affidavit that the average length of time taken to collect outstanding trade debt in the airline industry in 1997 was approximately thirty-five to forty days. The Court finds that invoices number 9167, 9205, and 9369 are all consistent with the industry norms, because they were paid between nine to thirty-five days from the shipment date.[8] However, the payment of invoice number 9256, falls outside the airline industry standards.[9]

## CONCLUSION

For the reasons stated within, it is therefore,

---

7. Mr. Faulkner is a Certified Public Accountant who is employed as a professional by the Trustee in the instant case and offered expert testimony in the adversary proceeding of *Hovis v. Stambaugh Aviation, Inc. (In re Air South Airlines, Inc.,* 165 B.R. 247).

8. The Trustee points out that invoices number 9205 and 9369 were paid in a substantially shorter time than the industry norms and argues that "[p]aying creditors at an acceler-

ated rate shortly before bankruptcy indicates a preferential transfer." However, the two transfers that the trustee refers to as being paid quicker than the industry norm are the invoices which indicated payment terms on a "check overnight" or "upon receipt" basis.

9. Invoice number 9256 also failed to meet the requirements set forth in subsection B; therefore, a consideration of whether it meets the requirements of subsection C is technically unnecessary.

ORDERED, that invoices number 9167, 9205, and 9369 were paid in the "ordinary course of business" pursuant to § 547(c)(2); therefore, summary judgment as it relates to those invoices is granted in favor of ASI.

IT IS FURTHER ORDERED that invoice number 9256 was not paid in the "ordinary course of business" and summary judgment as it relates to this invoice is denied.

AND IT IS SO ORDERED.