In re **FORMAN ENTERPRISES, INC., Debtor.**

**Carlota M. Bohm, Trustee for the Estate of Forman Enterprises, Inc., d/b/a American Outpost, Plaintiff,**

v.

**Golden Knitting Mills, Inc., Defendant.**

**Bankruptcy No. 00–20523 BM.
Adversary No. 02–02276 BM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

June 3, 2003.

Owen W. Katz, Pittsburgh, PA, for Plaintiff.

Peter N. Pross, Pittsburgh, PA, for Defendant.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The chapter 7 trustee seeks in accordance with § 547(b) of the Bankruptcy Code to avoid as a preference a transfer debtor Forman Enterprises, Inc. made to defendant Golden Knitting Mills, Inc. ("Golden") some five weeks prior to the filing of debtor's bankruptcy petition as payment for a shipment of sweaters previously received from Golden.

Golden denies that one of the requirements of a preference is present in this case. To the extent the transfer qualifies as a preference, Golden alternatively asserts that it falls within the scope of the "ordinary course" exception set forth at § 547(c)(2) of the Bankruptcy Code and therefore may not be avoided. The chapter 7 trustee in turn denies that certain of the requirements of § 547(c)(2) are present.

We conclude that the transfer at issue was a preference for purposes of § 547(b) but may not be avoided because it falls within the scope of the "ordinary course" exception found at § 547(c)(2). Judgment accordingly will be entered in favor of Golden and against the chapter 7 trustee.

### —FACTS—

Debtor was in the business of selling casual attire through retail outlets it operated known as American Eagle.

Golden is in the business of selling sweaters and other knitted apparel to retailers such as debtor. It is located in Montreal, Canada, and has customers in Canada and the United States.

Debtor placed a purchase order for sweaters with Golden on September 22, 1999. This was the first transaction between them. They had not previously done business with one another.

Because it was not familiar with debtor, Golden inquired two days later about debtor and received back a favorable credit report.

On October 29, 1999, Golden shipped the sweaters to debtor per its instructions. That same day Golden issued and sent to debtor an invoice which stated that the terms were "NET 30". Payment, in other words, was due in full thirty days from October 29, 1999—i.e., was due by no later

than November 28, 1999. The stated amount due was $115,200.00.

An employee of debtor telephoned an employee of Golden on or about November 9, 1999, to advise that debtor had received the sweaters and to request a copy of the above invoice. A copy of the invoice was faxed to debtor that same day.

Debtor did not pay for the sweaters by the due date specified on the invoice.

On December 2, 1999, four days after the due date indicated on the invoice had passed, debtor placed a second order for sweaters with Golden. An employee of Golden telephoned an employee of debtor the following day concerning payment of the first invoice.

Golden sent a fax to debtor on December 6, 1999, stating that payment of the first invoice was "now due" and enclosed another copy of the invoice. Golden stated that it "would appreciate receiving your cheque as soon as possible" and requested that debtor call it before mailing the check "in order to have it sent by Fedex at our expenses (sic)".

Thereafter Golden telephoned debtor about the matter and was referred to Ken Durrett, debtor's CFO. Golden called Durrett and left messages when it was unable to connect with him.

On December 9, 1999, Golden sent a fax to Durrett advising that the first order of sweaters had been shipped on October 29, 1999. The fax further stated that the payment term of the first shipment was "NET 30" and that payment was past due. Golden stated that it "would appreciate if payment of U.S. $115,200 was sent this week by Fedex at our expense".

Durrett spoke by telephone with defendant on December 10, 1999, and promised that payment for the first shipment would be sent to Golden by Federal Express. Based on Durrett's promise to pay for the first shipment, Golden shipped the second order of sweaters that same day.

On December 10, 1999, Golden issued an invoice for the second shipment of sweaters. The invoice stated that the payment term was "NET 30" and that the amount due was $52,000.00. Later that same day, for reasons unstated, Golden issued a credit memo in the amount of $23,400.00, thereby reducing the amount due for the second shipment to $28,800.00.

On December 17, 1999, seven days after Durrett had promised that payment would be made, debtor issued a check payable to Golden in the amount of $114,720.00 as payment in full for the first shipment of sweaters. Payment was made nineteen days after the due date specified on the invoice for the first shipment of sweaters and less than ninety days before debtor filed its bankruptcy petition.

Debtor never paid for the second shipment of sweaters prior to the filing of its bankruptcy petition. The amount due for this shipment is not at issue in this case.

On January 26, 2000, debtor filed a voluntary chapter 11 petition. The schedules accompanying the petition listed assets having a total declared value of $26,029,496.32 and liabilities totaling $37,106,791.87.

Debtor owned no real property. Its assets consisted entirely of various sorts of personalty. Office equipment and fixtures were listed as having a declared value of $6,025,243.27. Inventory was listed as having a book value of $17,558,330.00. Security deposits for its retail stores and outstanding accounts receivable were listed as having a total value of $2,447,923.05.

On the liability side, debtor's schedules indicated secured debt totaling $29,598,406.00. Of this amount, Citizens Bank and PNC Bank were listed as having

*separate* secured claims in the amount of $13,850,848.00. Other secured creditors were listed as having claims totaling $1,896,710.00. Unsecured priority claims and general unsecured claims respectively totaled $969,089.14 and $6,539,296.23.

It so happened that the schedules were not accurate. Instead of having separate secured claims in the amount of $13,858,848.00 apiece, Citizens Bank and PNC Bank were joint participants in a single secured claim in the amount of $13,858,848.00. The correct amount of secured debt owed by debtor at the time of its bankruptcy filing was $15,747,558.00, not $29,598,406.00.

The inaccuracies on the liability side of debtor's schedules did not end there. For reasons unknown, unsecured loans from insiders totaling $6,190,000.00 had been omitted from the schedules as filed. As a consequence, the total amount of general unsecured debt owed at the time of the bankruptcy filing was $12,729,296.23 instead of $6,539,296.23.

Finally, the value of debtor's inventory was grossly overstated. The value of its inventory was marked down by $6,239,594.00 in its 1999 federal income tax return, which was not filed until September of 2000, from $17,558,330.00 to $11,318,736.00. As a consequence, the total value of debtor's assets was reduced from $26,029,496.00 to $19,789,902.32, some $9,656,041.05 less than the above adjusted amount of its total liabilities.

Debtor's chapter 11 case was converted to a chapter 7 proceeding on February 6, 2001, when it became apparent that debtor was not able to successfully reorganize. Shortly thereafter a chapter 7 trustee was appointed.

The chapter 7 trustee brought this adversary action against Golden on May 22, 2002. According to the complaint, the above payment in the amount of $114,720.50, made on or about December 17, 1999, constituted a preferential transfer which may be avoided pursuant to § 547(b) and may be recovered from Golden pursuant to § 550(a) of the Bankruptcy Code.

The matter was tried on March 24, 2003, at which time both sides were given an opportunity to present evidence on the issues in the case. At trial Golden denied that one of the requirements of § 547(b) was satisfied in this case. In particular, it denied that debtor was insolvent for purposes of § 547(b)(3) when the contested December 17, 1999, transfer occurred. If the transfer was a preference for purposes of § 547(b), Golden alternatively asserted, it nonetheless was not avoidable because it was an "ordinary course" transfer within the meaning of § 547(c)(2) or because it fell within the meaning of the "new value" exception found at § 547(c)(4).

## —DISCUSSION—

### Was The Transfer A Preference For Purposes Of § 547(b)?

Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides in part as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

 (A) the case were a case under chapter 7 of this title;

 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ This provision aims to ensure that creditors are treated equitably, both by deterring a failing debtor from giving preferential treatment to its most obstreperous and demanding creditors "in an effort to stave off a hard ride into bankruptcy", and by discouraging creditors from racing to dismantle the debtor. *Fiber Lite v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 219 (3d Cir.1994).

■ The burden of proving each of these element lies with the chapter 7 trustee. 11 U.S.C. § 547(g). *Sender v. Johnson (In re Hedged–Investments Associates)*, 84 F.3d 1267, 1270 (10th Cir.1996); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). This the trustee must do by a preponderance of the evidence. *Official Committee of Unsecured Creditors v. Conceria Sabrina*, 195 B.R. 602, 612 (Bankr.M.D.Pa.1996).

■ It is presumed for purposes of § 547(b)(3) that the debtor was insolvent during the 90–day period immediately preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(f).

With the exception of § 547(b)(3), Golden concedes that all of the above requirements of § 547(b) are satisfied in this case. It denies, in other words, that debtor was insolvent when it paid the for the first shipment of sweaters on December 17, 1999.

■ An entity other than a partnership or a municipality is "insolvent" for purposes of the Bankruptcy Code when its financial condition is such that the sum of its debts is greater than all of its property at fair valuation. 11 U.S.C. § 101(32). Property transferred, concealed or removed with intent to hinder, delay, or defraud creditors along with property that may be exempted under § 522 is excluded from this calculus. This is known as the "balance sheet test": assets and liabilities are tallied at fair valuation to determine whether the entity's debts exceed its assets. *In re RML, Inc.*, 92 F.3d 139, 154–55 (3d Cir.1996).

■ The basis for Golden's denial that debtor was insolvent when it paid for the first shipment of sweaters is not entirely clear. It would appear to be based on the fact that debtor's schedules erroneously listed both Citizens Bank and PNC as having separate secured claims in the amount of $13,850,848.00 apiece when in reality they were joint participants in a single secured claim in that amount. From this Golden evidently would have us conclude that debtor's total liabilities should be reduced by $13,858,848.00 from $37,106,791.87 to $23,255,943.87 and that the total value of its assets—i.e., $26,029,496.32—consequently exceeds its actual liabilities by $2,773,552.45, in which case debtor was not insolvent when it paid for the first shipment of sweaters.

This argument is without merit. As we have seen, debtor also failed to schedule $6,190,000.00 in general unsecured debt for loans from insiders. In addition, we have seen that debtor overstated the value of its inventory by $6,239,594.00 and that said value accordingly should be reduced from $17,588,330.00 to $11,348,736.00.

Golden has not produced any evidence showing that these adjustments are unwarranted. Once these adjustments are taken into account, it follows that the total value of debtor's assets as of its bankruptcy petition should be reduced from $26,789,902.32 to $19,789,902.32, which is $9,656,041.55 less than the adjusted amount of its liabilities at that time.

Moreover, debtor was insolvent not only when it filed its bankruptcy petition; it also was insolvent when it made the above payment to Golden nearly six weeks earlier. Nothing occurred to make what was true on January 26, 2000, not true some five weeks earlier on December 17, 1999. Debtor, in other words, was insolvent on December 17, 1999, as well as on January 26, 2000.

We conclude in light of the foregoing that all of the requirements of § 547(b) are satisfied in this case and that the payment for the first shipment of sweaters was a preference.

### The "Ordinary Course Exception" § 547(c)(2).

Unless it falls within one of the "statutory safe harbors" set forth at § 547(c), the chapter 7 trustee is entitled to set aside the above transfer because it qualifies as a preference for purposes of § 547(b). *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp. (In the Matter of J.P. Fyfe, Inc. of Florida)*, 891 F.2d 66, 69 (3d Cir.1989).

As an alternative to its denial that the above payment was a preference, Golden asserts that it falls within the scope of § 547(c)(2), which provides in part as follows:

(c) the trustee may not avoid under this section a transfer—.....

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business ... affairs of the debtor and transferee;

(B) made in the ordinary course of business ... affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The purpose of this provision "is to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual actions by either the debtor or his creditors during the debtor's slide into bankruptcy". *Union Bank v. Wolas*, 502 U.S. 151, 160, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991). Section 547(c)(2) is designed to induce creditors to do business with a distressed debtor "so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy". *In re Molded Acoustical Products, Inc.*, 18 F.3d at 219–20.

Golden has the burden of proving that an otherwise preferential transfer is excepted from avoidance by any of the provisions found at § 547(c). See 11 U.S.C. § 547(g). Golden must prove each of the conjunctive elements found at § 547(c)(2) by a preponderance of the evidence. *United States Trustee v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.)*, 180 F.3d 504, 512 (3d Cir.1999).

The chapter 7 trustee concedes that § 547(c)(2)(A) is satisfied in this case. It is undisputed, in other words, that the transfer debtor made for the first shipment of sweaters was on account of a debt incurred in the ordinary course of the business affairs of debtor and Golden. It was in the ordinary course of debtor's business affairs to order sweaters and of Golden's

business affairs to sell them to retailers such as debtor.

What is in dispute are §§ 547(c)(2)(B) and (C). The chapter 7 trustee denies that they are satisfied in this case.

■ The requirement, found at § 547(c)(2)(B), that a transfer be made "in the ordinary course of business affairs ... of the debtor and the transferee" in common parlance would seem to presuppose that the debtor and the transferee previously had engaged in one or more previous transactions from which one might glean the ordinary course of their business affairs with one another.

Such an historical approach is not possible in this case for the simple reason that debtor and Golden had not done business with one another prior to the transfer at issue here. As far as we are able to determine, the United States Court of Appeals for the Third Circuit has not addressed what we are to do in such a situation. Courts that have addressed it have given different answers.

Some courts have articulated a *per se* rule that the transfer in question as a matter of law *cannot* qualify as an ordinary course transaction for purposes of § 547(c)(2)(B). *E.g., Miller v. Kibler (In re Winters)*, 182 B.R. 26, 28 (Bankr. E.D.Ky.1995); *Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload, Inc.)*, 152 B.R. 690, 691 (Bankr. N.D.Ga.1992).

Most courts addressing this issue have rejected this approach and have held instead that a transaction may be in the "ordinary course" even if it is the very first transaction between the debtor and the creditor. *E.g., Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir.1990); *Hovis v. Stambaugh Aviation, Inc. (In re Air South Airlines)*, 247 B.R. 165, 171–72 (Bankr.D.S.C.2000); *Tomlins v. BRW Pa-*

*per Co. (In re Tulsa Litho Co.)*, 229 B.R. 806, 808 (10th Cir. BAP 1999); *Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.)*, 92 B.R. 737, 740 (W.D.Mich.1988).

We concur with those courts that have rejected the above *per se* rule. A first-time transaction between a debtor and a creditor in certain circumstances may qualify as an ordinary course transaction for purposes of § 547(c)(2)(B). A *per se* rule in our estimation would discourage rather than encourage first-time creditors from doing business with a struggling debtor during the ninety-day preference window. The majority view far better serves to further the purpose underlying § 547(c)(2) than does the minority view.

■ If a first-time transaction between a debtor and a creditor may qualify as "ordinary course" for purposes of § 547(c)(2), it remains for us to articulate a procedure or method for determining when such a transaction so qualifies.

What is required for a transfer to be made "in the ordinary course" of the business affairs of a debtor and a creditor is not explained anywhere in the Bankruptcy Code. Because no such standard exists, we must engage in a "peculiarly factual analysis". *Waldschmidt v. Ranier & Associates (In re Fulghum Construction Corp.)*, 872 F.2d 739, 742 (6th Cir.1989).

What is in the "ordinary course" of business in this regard is subjective, as opposed to objective, and calls for us to consider whether the transfer was ordinary as between the debtor and the creditor. *In re First Jersey Securities*, 180 F.3d at 512. Relevant factors may include the time, the amount and the manner in which payment occurred. *Id.*

Some courts have held that when making this determination we must look to the terms of the parties' agreement. *E.g.,*

*Warsco v. Household Bank,* 272 B.R. 246, 252–53 (Bankr.N.D.Ind.2002); *In re Russell Cave Co., Inc.,* 259 B.R. 879, 883–84 (Bankr.E.D.Ky.2001).

While this approach may be probative in certain instances—e.g., when a debtor and a creditor arrived at an agreement after arms'-length negotiations—, it is not very illuminating in the present context.

The invoice in this case was issued some five weeks *after* debtor ordered the sweaters and contemporaneously with their shipment. There is no basis for concluding that debtor and Golden had agreed by then that payment was due no later than thirty days from the date of shipment. It is more likely that no due date for payment had been agreed to either prior to or at the time of shipment. Moreover, the subsequent conduct of debtor and Golden is consistent with the conclusion that they were proceeding "by the seat of their pants" and worked out mutually acceptable payment terms along the way.

Finally, even if the invoice were illuminating in this regard, nothing would have prevented debtor and Golden from agreeing to different payment terms after the sweaters were shipped and the invoice was issued.

Other courts that have rejected the above *per se* rule have held that we should examine the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt. If nothing unusual or untoward occurred, there is no good reason to conclude that the transfer was out of the ordinary. *E.g., In re Morren Meat & Poultry Co.,* 92 B.R. at 740; *In re Air South Airlines, Inc.,* 247 B.R. 153, 163 (Bankr.D.S.C.2000).

■ Although this approach undeniably is "fuzzy around the edges" and at times difficult to apply, in our estimation it provides the best method for ascertaining in this case whether the payment debtor made on December 17, 1999, for the sweaters Golden had shipped was "ordinary course".

Applying this approach to the conduct of debtor and Golden between October 29, 1999, and December 17, 1999, we find nothing unusual that would lead us to infer that the payment in question was out of the ordinary course of business for debtor and Golden.

On December 2, 1999, four days after the due date specified on the invoice Golden issued in connection with the first shipment of sweaters, debtor placed a second order for sweaters with Golden. This was the first contact between the parties after the purported due date had passed without payment being made for the first shipment of sweaters. Debtor initiated the contact.

Golden responded the next day—i.e., on December 3, 1999—by telephoning debtor to inquire concerning payment of the amount due for the first shipment. This was the first time Golden initiated contact with debtor after passage of the purported due date. As we shall see, it was in response to and related to debtor's placement of a second order for sweaters and was not an attempt on Golden's part to get debtor to make a past-due payment.

After December 3, 1999, but prior to December 9, 1999, Golden telephoned debtor and was referred to debtor's CFO. Golden left messages for the CFO when it was not able to connect with him. On December 9, 1999, Golden sent a fax to debtor's CFO advising that the payment term of the first shipment was "NET 30" and was due on November 28, 1999. The fax further stated that payment that week would be "appreciated". We do not view these actions by Golden as an attempt on

its part to extract a past-due payment from debtor. We instead view them as a prelude to its ultimately agreeing to ship the second order of sweaters.

On December 10, 1999, after debtor's CFO contacted Golden and had promised that payment for the first shipment would be sent by Federal Express. Golden relied on this promise and shipped the second order of sweaters that same day. The promise to pay for the first shipment comprised partial consideration for the second shipment.

As a *quid pro quo*, in other words, debtor agreed that it would promptly pay for the first shipment of sweaters if Golden shipped the second order. When viewed in this context, the evidence does not support the inference that the parties considered debtor to be in default with respect to payment of the first invoice or that Golden had resorted to extraordinary measures in an attempt to dragoon debtor into making a past-due payment for the first shipment of sweaters.

On December 17, 1999, seven days after debtor had promised to pay for the first shipment as inducement for Golden to ship the second order, debtor paid in full the amount due for the first shipment of sweaters.

As we view the course of conduct of debtor and Golden during this time period, no unusual conduct occurred between November 29, 1999, and December 17, 1999, which would warrant the conclusion that the payment debtor made on December 17, 1999, was a departure from the ordinary course of business between debtor and Golden.

The course of their dealings evolved over time. That course of dealing had not been established when Golden issued its invoice for the first shipment of sweaters. It was established only when debtor and Golden agreed to and did make the second shipment. When viewed from this perspective, it follows that the transfer at issue was not made outside of the ordinary course of their business relationship and that Golden has met it burden of proof with respect to § 547(c)(2)(B).

It remains to be determined whether Golden also has established that the payment debtor made on December 17, 1999, "was made according to ordinary business terms" for purposes of § 547(c)(2)(C). The chapter 7 trustee denies that it was so made in this case.

 Section 547(c)(2)(C) must be established separately and apart from § 547(c)(2)(B). Its focus goes beyond what is normal as between debtor and its creditor. *In re Molded Acoustical Products*, 18 F.3d at 223–24.

As is the case with § 547(c)(2)(B), there is no bright-line test for ascertaining whether a transfer was "made according to ordinary business terms" for purposes of § 547(c)(2)(C). The phrase encompasses a broad range of practices engaged in by businesses similar in some general way to the creditor in question. Only dealings that are so unique as to fall outside this broad range should be considered extraordinary and beyond the scope of § 547(c)(2)(C). *Id.*, 18 F.3d at 224.

 A creditor seeking to find "safe harbor" under this provision need not prove the existence of a single uniform set of industry-wide credit terms. The standard is an "accommodating" one. *Id.*

 The more "cemented" the relationship between the parties, the more the creditor will be permitted to diverge and vary its credit terms from those of the relevant industry in general. *Id.*, 18 F.3d at 225. If their relationship is of recent origin or was forged only after or shortly before the debtor sailed into financially

troubled waters, the credit terms will have to endure a rigorous comparison to terms generally prevailing in a relevant industry. *Id.*

■ A creditor is allowed considerable latitude in describing the relevant industry. Even departures from that industry's norms which are not so flagrant as to be "unusual" lie within the protection afforded by § 534(c)(2)(C). *Id.,* 18 F.3d at 226.

■ Whereas the test for § 547(c)(2)(B) is subjective, the test for § 547(c)(2)(C) is objective in nature. *Id.*

■ Debtor in this case paid for the first shipment of sweaters nineteen days after the "NET 30" due date specified on the invoice Golden issued when it shipped the sweaters.

The chapter 7 trustee and Golden have stipulated that payments Golden received from its customers in the United States were typically received after the due date specified on the invoice.

Aside from debtor, Golden had six customers in the United States between 1998 and 2000 with "NET 30" terms. Some of them, like debtor, were first-time customers. It had two other customers with "NET 60" terms and one with payment due ten days prior to the end of the month. Payments from these other "NET 30" customers ranged from seven to thirty days after the stated due date. On average payments from these customers were eighteen days late, one day less than in debtor's case.

Golden's general manager and others familiar with the knitted apparel industry testified on behalf of Golden that a payment received nineteen days after a "NET 30" due date was considered to be not only normal, but also prompt. So long as payments from such customers were made within thirty days after the "NET 30" due

date, the parties were operating according to ordinary terms in the industry.

They testified that whereas a payment received late on an invoice with "NET 90" or "NET 120" terms would not be considered prompt and ordinary in the knitted apparel industry, payment received on a "NET 30" invoice that was twenty days past due was not considered to be out of the ordinary.

Finally, testimony was offered that it was common for Golden's major competitors to receive and accept payment fifteen to twenty beyond a "NET 30" due date.

We are satisfied that the above evidence pertains to the practices of businesses that generally are similar to Golden and which belong to the same general industry as it does.

The chapter 7 trustee has raised a host of objections to the probative value of the testimony Golden presented concerning the practices of others in the knitted apparel industry. The objections in our estimation are quibbling. *In re Molded Acoustical Products* teaches that the standard pertaining to § 547(c)(2)(C) is "accommodating" and that a creditor has "considerable latitude" in establishing what is a relevant industry. 18 F.3d at 224–26. The evidence presented by Golden in our estimation establishes that debtor's payment for the first shipment of sweaters was made "according to ordinary business terms" for purposes of § 547(c)(2)(C).

We conclude in light of the foregoing that Golden has established all of the requirements for the exception set forth at § 547(c)(2)(C) and that the December 17, 1999, payment debtor made to Golden may not be avoided even though it was a preference for purposes of § 547(b).