In re AMERICAN HOME MORTGAGE
HOLDINGS, INC., et al.,[1] Debtors.

Steven D. Sass, as Plan Trustee of the
American Home Mortgage Plan
Trust, Plaintiff,

v.

Vector Consulting, Inc., Defendant.

Bankruptcy No. 07–11047 (CSS).

Adversary No. 09–51611 (CSS).

United States Bankruptcy Court,
D. Delaware.

June 5, 2012.

---

1. The Debtors in these cases are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. (f/k/a American Home Mortgage Servicing Inc.); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

Alan Michael Root, Bonnie Glantz Fatell, Victoria A. Guilfoyle, Blank Rome

LLP, Wilmington, DE, Edward L. Schnitzer, Jeffrey Zawadzki, Mark S. Indelicato, Hahn & Hessen LLP, New York, NY, for Plaintiff.

Eric J. Monzo, Morris James LLP, Wilmington, DE, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

This matter comes before the Court following trial conducted on September 23, 2011 and concluded on October 3, 2011 (the *"Trial"*). After due deliberation, and sufficient cause appearing, the Court makes the following findings of fact and conclusions of law with respect to the applicability of defendant Vector Consulting, Inc.'s defenses permitted under 11 U.S.C. § 547(c) (*"Findings and Conclusions"*). These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure (*"Bankruptcy Rules"*). Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

### FINDINGS OF FACT

#### Procedural Background

1. On August 6, 2007 (the *"Petition Date"*), the above-captioned debtors (the *"Debtors"*) filed the underlying bankruptcy petitions in this Court pursuant to chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*). On or about July 28, 2009, the Official Committee of Unsecured Creditors (the *"Committee"*) appointed in the above-captioned bankruptcy action commenced this adversary proceeding against Vector Consulting, Inc. (*"Vector"* or *"Defendant"*), seeking to avoid and recover four (4) payments totaling $29,920.00 alleging that the Transfers were avoidable as preferential transfers (Adv. Dkt. No. 1). By Order dated January 19, 2011, Steven D. Sass, as Plan Trustee for the American Home Mortgage Plan Trust, was substituted in place and instead of the Committee (the *"Plaintiff"*). (Adv. Dkt. No. 31).

2. The ninety-day period prior to the Petition Date ran from May 8, 2007 through August 6, 2007 (the *"Preference Period"*).

3. During the Preference Period, Vector received a total of four (4) checks (the *"Preference Period Checks"*) totaling $29,920.00 (the *"Preference Period Transfers"*). The Preference Period Checks are summarized as follows:

| Check Number | Check "Cut" Date | Check "Clear" Date | Check Amount |
|---|---|---|---|
| 303161 | 05/02/07 | 05/16/07 | $12,920.00 |
| 309771 | 05/25/07 | 06/06/07 | $ 5,440.00 |
| 318859 | 06/29/07 | 07/06/07 | $ 6,120.00 |
| 319551 | 07/03/07 | 07/11/07 | $ 5,440.00 |

4. The Preference Period Checks were made by debtor American Home Mortgage Corp. (*"Debtor"* or *"AHM"*) during the Preference Period.

5. On October 29, 2009, Vector filed its answer and affirmative defenses to the Complaint (Adv. Dkt. No. 5). Vector asserted that it has complete defenses to the causes of action alleged in the Complaint, because among other things, the Transfers were not avoidable pursuant to section 547(c) of the Bankruptcy Code.

6. Following argument on competing summary judgment motions, the Court held that the Plaintiff satisfied its *prima facie* case under section 547(b) of the

Bankruptcy Code and held that issues of material fact exists to warrant a trial with respect to Defendant's defenses, including its defenses asserted pursuant to section 547(c) of the Bankruptcy Code.[2]

7. Trial commenced relating to Vector's section 547(c) defenses on September 23, 2011 and concluding on October 3, 2011. During the Trial, the Court considered evidence and heard testimony of three (3) witnesses offered by Vector—an employee Tracey Belton; its Chief Executive Officer, Manbir Khurana; and its expert witness, Bradley Sienkiewicz, CPA. Plaintiff offered the testimony of one witness, Belinda A. Jones, a former employee of the Debtor.

8. Vector contends that it has a completed ordinary course of business defense permitted under section 547(c)(2) of the Bankruptcy Code and to a limited extent, also has a new value defense permitted under sections 547(c)(4) and/or 547(c)(1) of the Bankruptcy Code that precludes any preference liability.

***Factual Background and History Between the Parties***

9. At trial, Vector offered the testimony of its Chief Executive Officer, Manbir Khurana (9/23/11 Trial Transcript (*"Tr."*) at 34:8–121:4). The Court finds Mr. Khurana's testimony persuasive and credible. Mr. Khurana testified that Vector is in the business of staffing temporary information technology (*"IT"*) professionals (Tr. 34:23–25). Mr. Khurana testified that he has over thirteen (13) years of experience with Vector (Tr. 35:8) and has served as its

CEO for two years (9/23/11 Tr. 34:14–19). Mr. Khurana has been in the information technology industry since 1986 (9/23/11 Tr. 35:18–19).

10. Vector and AHM entered into a Professional Service Agreement (the *"PSA"*) in October of 2006 (Defendant's Exhibit *"Def. Ex."* 1). The parties contemplated a three (3) month contract to provide the programming services of Peter Lindner to AHM for a SAS programming project (Def. Ex. 1 at Ex. A). The PSA, however, was extended for a total of eight (8) months (9/23/11 Tr. 39:24). The PSA remained in effect through the duration of the parties' relationship (9/23/11 Tr. 39:25–40:2).

11. The PSA provided that payments were to be made to Vector within thirty (30) days after AHM's receipt of invoices (Def. Ex. 1 at par. 3). The PSA designated Bonnie Singh as AHM's project manager (Def. Ex. 1 at Ex. A; 9/23/11 Tr. 38:8). Vector emailed its invoices to Ms. Singh (9/23/11 Tr. 39:5–8) for payment after Vector received a signed time sheet from AHM that approved Mr. Lindner's professional services (9/23/11 Tr. 38:23–39:4). Vector was then paid for all invoices except for one, invoice number 23991 dated July 27, 2007, in the amount of $1,360 (9/23/11 Tr. 41:22–42:3).

12. Mr. Khurana testified in accordance with Vector's customer ledger that Vector applied the four (4) Preference Period Checks to five (5) of Vector's invoices (Def. Ex. 2; 9/23/11 Tr. 40:14–42:23) as follows:

---

**2.** As noted on the record at the hearing regarding the motions for summary judgment, Plaintiff withdrew or abandoned its cause of action asserted under section 548 of the Bankruptcy Code.

| Invoice Date | Invoice Number | Invoice Amount | Date Payment was Received by Vector | Payment Amount | Difference in Days Between Invoice Date and Date Payment was Received by Vector |
|---|---|---|---|---|---|
| 3/8/2007 | 23577 | $5,440.00 | 5/7/2007 | $5,440.00 | 60 |
| 4/3/2007 | 23653 | $7,480.00 | 5/7/2007 | $7,480.00 | 34 |
| 4/20/2007 | 23702 | $5,440.00 | 6/6/2007 | $5,440.00 | 47 |
| 5/4/2007 | 23737 | $6,120.00 | 7/5/2007 | $6,120.00 | 62 |
| 5/18/2007 | 23799 | $5,440.00 | 7/9/2007 | $5,440.00 | 52 |

13. According to Mr. Khurana it was Vector's normal practice to apply payment of corresponding amounts to the oldest invoice first and would investigate further only if payment and invoice amounts did not match (9/23/11 Tr. 46:1–48:15). In many instances, the invoices were of similar amounts because the invoices were based on the weekly hours worked by Mr. Lindner (Def. Ex. 2). Vector would only compare its records to its clients records regarding payment if there was a difference in the amount of payment when compared to an invoice (9/23/11 Tr. 48:2–8).

14. Mr. Khurana testified that this payment practice was consistent with all of Vector's customers (9/23/11 Tr. 49:14–17) and was consistent throughout the eight (8) month payment history between Vector and the Debtor (9/23/11 Tr. 49:10–13).

15. During the Preference Period, according to Vector's accounting records, all but one Preference Period Check paid one invoice of corresponding amount (Def. Ex. 2). Invoices dated March 8, 2007 and April 3, 2007 were paid concurrently by the Debtor with the $12,920.00 Preference Period Check received on May 7, 2007 (Def. Ex. 2).

16. Mr. Khurana testified that between May 7, 2007 and May 17, 2007, Mr. Lindner worked a total of sixty four (64) hours (Def. Ex. 4A and Ex. 4B; 9/23/11 Tr. 63:16–64:8; 9/23/11, 65:9–17). Pursuant to the PSA, the hourly rate that the Debtor agreed to pay for Mr. Lindner's services was $85.00 per hour (Def. Ex. 1 at Ex. A). Accordingly, AHM was invoiced a total of $5,440.00 for Mr. Lindner's services between May 7, 2007 through May 17, 2007 (Def. Ex. 4A and Ex. 4B).

17. Prior to the Preference Period, or the "Historical Period," the parties engaged in a similar course of payment. According to Vector's accounting records (Def. Ex. 2; 9/23/11 Tr. 40:14–42:23), the Historical Period payments are detailed as follows:

| Invoice Date | Invoice Number | Invoice Amount | Date Payment was Received by Vector | Payment Amount | Difference in Days Between Invoice Date and Date Payment was Received by Vector |
|---|---|---|---|---|---|
| 10/18/2006 | 23160 | $4,675.00 | 11/8/2006 | $4,675.00 | 21 |
| 11/3/2006 | 23212 | $8,160.00 | 1/8/2007 | $8,160.00 | 67 |
| 11/22/2006 | 23256 | $7,480.00 | 11/30/2006 | $7,480.00 | 8 |
| 12/6/2006 | 23311 | $6,120.00 | 12/18/2006 | $6,120.00 | 12 |
| 12/20/2006 | 23337 | $7,480.00 | 2/12/2007 | $7,480.00 | 54 |
| 1/3/2007 | 23377 | $6,120.00 | 1/25/2007 | $6,120.00 | 22 |
| 1/18/2007 | 23421 | $6,120.00 | 1/25/2007 | $6,120.00 | 7 |
| 2/1/2007 | 23467 | $7,480.00 | 2/21/2007 | $7,480.00 | 20 |
| 2/21/2007 | 23528 | $7,480.00 | 3/1/2007 | $7,480.00 | 9 |
| 3/23/2007 | 23625 | $7,480.00 | 4/11/2007 | $7,480.00 | 19 |

18. As evident from Vector's customer ledger, all but one payment during this Historical Period paid one corresponding invoice (Def. Ex. 2). The January 25, 2007 payment of $12,240.00 paid two invoices each in the amount of $6,120.00 (Invoice Nos. 23377 and 23421) (Def. Ex. 2).

19. The payments made during the Historical Period were similar in amount when compared to the Preference Period Transfers (Def. Ex. 2).

20. During the Historical Period, the payments made by the Debtor to Vector ranged from $4,675.00 to $12,240.00 (Def. Ex. 2).

21. The payments made by the Debtor during the Preference Period ranged from $5,440.00 to $12,920.00 (Def. Ex. 2).

22. According to Vector's accounting records, the invoices paid by payments during the Historical Period were similar to the invoices paid by the Preference Period Transfers (Def. Ex. 2).

23. According to Vector's accounting records, the range in the amount of invoices paid during the Historical Period was $4,675.00 and $8,160.00 (Def. Ex. 2).

24. According to Vector's accounting records, the range in the amount of invoices paid the Preference Period was $5,440.00 and $7,480.00 (Def. Ex. 2).

25. According to Vector's accounting records, during the Historical Period, payments were made between 7 to 67 days after invoice (Def. Ex. 2).

26. During the Preference Period, according to Vector's accounting records, the number of days between invoice date and payment fell within this range. Specifically, the time between invoice date and payment ranged between 34 to 62 days (Def. Ex. 2).

27. Mr. Khurana testified that it was Vector's customary procedure to first meet internally regarding open invoices then follow-up with clients to inquire about payment regarding open invoices that were due (9/23/11 Tr. 53:12:15–21). It was important to Vector to maintain a process and very politely manage the customer relationship as to maintain a continued business relationship (9/23/11 Tr. 56:11–21). Mr. Khurana testified that an employee within Vector's accounting department would politely inquire about the status of payment (9/23/11 Tr. 55:15–21).

28. According to emails exchanged between the parties (Plaintiff's Ex. 14) that were part of the Debtor's accounts receivable records indicating approval for AHM's payment to Vector, two invoices—Invoice Number 23702, dated April 20, 2007, in the amount of $5,440.00 and Invoice Number 23737, dated May 4, 2007, in the amount of $6,120.00—were resubmitted on June 13, 2007 (Plaintiff's ("Pl.") Ex. 14 at AHM00033) to the Debtor because Bonnie Singh was on maternity leave (Pl. Ex. 14 at AHM00034; 9/23/11 Tr. 59:5–9) and the invoices were not processed for payment (9/23/11 Tr. 58:17–22). Debtor requested additional copies of the invoices prior to processing payment (Pl. Ex. 14 at AHM00033; 9/23/11 Tr. 31:7–10).

29. Both invoices were emailed by Vector's Tracey Belton to the Debtor's accounts payable representative, Sunitha Abraham, on or about June 13, 2007 (Pl. Ex. 14 at AHM00033). Ms. Belton sent a follow-up email on June 26, 2007 to further inquire about payment (Pl. Ex. 14 at AHM0032).

30. Thereafter, on July 5, 2007, payment of $6,120.00 (in the same amount as Invoice Number 23737) was made to Vector (Def. Ex. 2).

31. This payment was made 22 days after Invoice Number 23737 was resubmitted by Vector on June 13, 2007.

32. Similarly, on July 9, 2007, payment of $5,440.00 (in the same amount as Invoice Number 23702) was made to Vector (Def. Ex. 2).

33. This payment was made on or about 26 days after Invoice Number 23737 was emailed by Vector on June 13, 2007.

34. Vector did not apply any pressure on Debtor to make payments (9/23/11 Tr. 62:7–9).

35. Vector did not assess any late fees during the Preference Period (Compare Pl. Ex. 2) (copies of invoices paid during the Preference Period) and Pl. Ex. 5 (copies of invoices during the Historical Period).

36. Mr. Khurana opined that based on his experience the payments—including the Preference Period Checks—made by AHM to Vector were made within the ordinary course of business (9/23/11 Tr. 62:10–14).

37. On rebuttal, the Plaintiff offered Debtor's accounts payable records through Belinda Jones, a former accounts payable clerk of AHM (10/3/2011 Tr. 14:16–33:25). Plaintiff introduced the Debtor's accounts payable records, including copies of checks, remittance information included with each check paid to Vector, invoices and supporting approval attached to select invoices.

38. According to AHM's accounts payable records and remittance information included with each check paid to Vector (Pl. Ex. 1), the Preference Period Checks were applied to Vector's invoices as summarized in the chart (Pl. Ex. 6) below:

| Check Number | Check "Cut" Date | Check "Clear" Date | Check Amount | Invoice Number | Invoice Date | Invoice Amount Paid | Days to Pay (Clear) |
|---|---|---|---|---|---|---|---|
| | | | | 23625 | 03/23/07 | $7,480.00 | 54 |
| 303161 | 05/02/07 | 05/16/07 | $12,920.00 | 23577 | 03/08/07 | $5,440.00 | 69 |
| 309771 | 05/25/07 | 06/06/07 | $5,440.00 | 23799 | 05/18/07 | $5,440.00 | 19 |
| 318859 | 06/29/07 | 07/06/07 | $6,120.00 | 23737 | 05/04/07 | $6,120.00 | 63 |
| 319551 | 07/03/07 | 07/11/07 | $5,440.00 | 23702 | 04/20/07 | $5,440.00 | 82 |

39. According to Debtor's accounts payable records and remittance information included with each check paid to Vector (Pl. Ex. 4), during the Historical Period, AHM's payments were applied to Vector's invoices as summarized in the chart below:

| Check Number | Check "Cut" Date | Check "Clear" Date | Check Amount | Invoice Number | Invoice Date | Invoice Amount Paid | Days to Pay (Clear) |
|---|---|---|---|---|---|---|---|
| 250389 | 11/03/06 | 11/09/06 | $4,675.00 | 23160 | 10/18/06 | $4,675.00 | 22 |
| 257567 | 11/28/06 | 12/01/06 | $7,480.00 | 23256 | 11/22/06 | $7,480.00 | 9 |
| 260917 | 12/11/06 | 12/20/06 | $6,120.00 | 23311 | 12/06/06 | $6,120.00 | 14 |
| 267872 | 01/03/07 | 01/10/07 | $8,160.00 | 23212 | 11/03/06 | $8,160.00 | 68 |
| | | | | 23377 | 01/03/07 | $6,120.00 | 23 |
| 272041 | 01/19/07 | 01/26/07 | $12,240.00 | 23421 | 01/18/07 | $6,120.00 | 8 |
| 278221 | 02/07/07 | 02/15/07 | $7,480.00 | 23467 | 02/01/07 | $7,480.00 | 14 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 279682 | 02/13/07 | 02/23/07 | $7,480.00 | 23337 | 12/20/06 | $7,480.00 | 65 |
| 282704 | 02/23/07 | 03/08/07 | $7,480.00 | 23528 | 02/21/07 | $7,480.00 | 15 |
| 294692 | 04/04/07 | 04/12/07 | $7,480.00 | 23653 | 04/03/07 | $7,480.00 | 9 |

40. As evident from Plaintiff's accounts payable records, during the Preference Period the amount of payments ranged from $5,440.00 to $12,920.00 (Pl. Ex. 6). During the Historical Period, the amount of payments made by the Debtor to Vector ranged in amount from $4,675.00 to $12,240.00 (Pl. Ex. 6).

41. As evident from Plaintiff's accounts payable records, during the Preference Period the invoice paid by the Preference Period Checks ranged between $5,440.00 to $7,480.00 (Pl. Ex. 6). During the Historical Period, the invoices paid by AHM to Vector ranged between $4,675.00 to $8,160.00 (Pl. Ex. 6).

**Expert Testimony of Bradley Sienkiewicz**

42. Vector offered the testimony of Bradley Sienkiewicz to support its ordinary course of business defense (9/23/11 Tr. 126:15–206:20). Mr. Sienkiewicz is a certified public accountant and an audit and advisory principal with the accounting firm of Arnold, Gallivan & Leveque in Atlanta, Georgia (9/23/11 Tr. 126:22–24; 127:2–3). He has practiced accounting for over eight years and earned a bachelor of accounting degree from the University of Georgia (9/23/11 Tr. 126:15–17). As part of his role as an advisory principal, he reviews accounts receivables and analyzes payment data (9/23/11 Tr. 128:1–5). In this regard, he testified that he is familiar with the standard payment practices of the IT staffing industry (9/23/11 Tr. 128:10–24; 130:18–131:7).

43. Mr. Sienkiewicz testified that he has two or three other clients that are direct competitors of Vector in the IT staffing industry and has clients that engage in similar procedures as Vector relating to accounts receivables (9/23/11 Tr. 128:10–18).

44. Mr. Sienkiewicz opined that based on his experience in the IT staffing services industry, an analysis of other similarly situated companies and an analysis of the actual payment history and practices between AHM and Vector, that the payments made by AHM to Vector were made within the ordinary course of business (9/23/11 Tr. 131:23–132:3; 132:4–6). His opinion was based upon his report (9/23/11 Tr. 131:23–25) and was unchanged by Mr. Khurana's testimony (9/23/11 Tr. 132:4–9).

45. Following trial, Plaintiff filed *The Motion of Plaintiff Steven D. Sass, As Plan Trustee of The American Home Mortgage Plan Trust For Entry of an Order Striking the Expert Testimony of Bradley Sienkiewicz* ("Motion to Strike"). Plaintiff argues in its Motion to Strike that Vector should be precluded from presenting the expert testimony because Mr. Sienkiewicz testified at trial that in forming his opinion he had reviewed certain documents that were not noted in his expert report nor produced in response to Plaintiff's discovery requests.

46. The purpose of initial disclosures provided for in Rule 7026 is to prevent a party from being unfairly surprised by the presentation of new evidence. *See Tracinda Corporation v. DaimlerChrysler AG*, 362 F.Supp.2d 487, 506 (D.De.2005)(evaluating Pennypack[3] factors

---

**3.** In determining whether to exclude evidence under Rue 37, the court should consider such factors as:

to admit expert testimony). Courts must be mindful that the "exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the preponderance of the evidence." *Id.*

47. Mr. Sienkiewicz's report contains the facts and data considered by him in forming his opinion that transfers were made in the ordinary course of business required by Bankruptcy Rule 7026(2)(B)(ii). As first noted in this report, Mr. Sienkiewicz opined that the alleged transfers were made within ordinary business terms based upon the industry standard. *See e.g.,* Sienkiewicz report at pp. 6–8. To this end, he relied upon information including the documents provided by Vector, Plaintiff, his experience and available industry data. *Id.* at p. 1.

48. There was no unfair surprise or new evidence. The subject matter of Mr. Sienkiewicz's trial testimony was consistent with and not materially different from the opinions in his report. *See* 9/23/11 Tr. at 142:20–22; Tr. at 156:4–6; Tr. 159:13–25; Tr. 160:15–20. Because Mr. Sienkiewicz's trial testimony was consistent with and not material different from the opinions contained in his report, there is no justification to exclude his testimony.

49. To the extent that any testimony was different from what was contained in this expert report, such differences were immaterial or in response to evidence elicited at trial for which Mr. Sienkiewicz was permitted to opine pursuant to Federal Rule of Evidence 703. Rule 703 (Bases of Opinion Testimony by Expert) provides

"(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and

that an expert may base his opinion or inference that are perceived by him or made known at or before trial. For example, Mr. Sienkiewicz was present during cross examination of Mr. Khurana regarding Vector's industry (*see e.g.,* 9/23/11 Tr. at 69:23–70:1 (NAICS testimony)) and subsequently, testified regarding the NAICS codes and the research tools he relied upon in rendering his opinion (9/23/11 Tr. at 141:15–147–:19).

50. There was no willful deception or "flagrant disregard" of a court order to warrant relief requested by the Plaintiff. Mr. Sienkiewicz's report was sent to the Plaintiff on October 15, 2010. Within days, Plaintiff was provided with copies of Mr. Sienkiewicz's file that he relied upon in rendering the report. The documents identified in Mr. Sienkiewicz's report were produced during discovery. Indeed, Plaintiff, requested to depose Mr. Sienkiewicz, but then withdrew this request. Any doubt regarding the production of documentation relied upon Mr. Sienkiewicz should have been addressed prior to trial soon after Plaintiff reviewed the information contained in his file.

51. Mr. Sienkiewicz's testimony should be admitted in its entirety. At best, Plaintiff's objection to the information relied upon by the expert in reaching his conclusions goes to the weight of the evidence not admissibility. *See e.g. AstraZeneca LP v. Tap Pharmaceutical Prods., Inc.,* 444 F.Supp.2d 278 (D.Del.2006).

52. The Plaintiff did not offer expert testimony.

efficient trial of the case or other causes in Court, and (4) bad faith or willfulness in failing to comply with the court's order." *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904–905 (3d Cir.1977).

## CONCLUSIONS OF LAW

■ 53. While the Trustee has satisfied all of the elements of section 547(b) of the Bankruptcy Code, the Preference Period Transfers nevertheless may not be avoided if each and every transfer satisfies of the exemptions set forth in section 547(c) of the Bankruptcy Code.[4] Vector, as the party contending that the transfer falls under one of the exemptions, bears the burden of proving that assertion by a preponderance of the evidence.[5]

54. Vector has satisfied its burden of proving that the Preference Period Transfers are protected from avoidability pursuant to section 547(c) of the Bankruptcy Code. Vector has established that the Transfers are not avoidable because all four (4) Preference Period Transfers were made in the ordinary course of business pursuant to section 547(c)(2) of the Bankruptcy Code. While Vector has a complete "ordinary course of business" defense, Vector has also met its burden of proof that it provided "new value" of $5,440.00 and therefore, the $12,920.00 payment received by Vector on May 7, 2007, is, in part, protected from avoidability pursuant to section 547(c)(4) and/or (c)(1) of the Bankruptcy Code.

### Ordinary Course of Business Defense

55. Section 547(c)(2) permits a "safe harbor" for a transfers of a preferential payment if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was" (a) made in the ordinary course of business of the debtor and transferee, or (b) made according to "ordinary business terms."[6]

56. The parties stipulated that all of the Preference Period Transfers were incurred in the ordinary course of business of AHM and Vector pursuant to section 547(c)(2)(A). *See* Joint Pretrial Memorandum at ¶ 27 (Adv. Dkt. No. 58). Accordingly, the Court is asked to determine whether any or all of the Preference Period Transfers were (a) made in the ordinary course of business of AHM and Vector, or (b) made according to "ordinary business terms." While Vector is only required to satisfy either one of these prongs, as set forth below, Vector has satisfied its burden to as to both prongs.

**(a)** *Each of the Preference Period Transfers were made within the ordinary course of business between the parties.*

■ 57. Section 547(c)(2)(A) represents a subjective inquiry, which contemplates the normal payment practice between the parties.[7] Generally, in evaluating a defendant's ordinary course of business defense, after establishing that the alleged payments were for a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee, the courts then look for certain hallmarks to determine whether the transfers were not in the ordinary course of business, including: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there

---

4. *Burtch v. Detroit Forming, Inc. (In re Archway Cookies),* 435 B.R. 234, 240 (Bankr. D.Del.2010) (internal citations omitted).

5. *Id.* (citing 11 U.S.C. § 547(g)).

6. 11 U.S.C. § 547(c)(2)(A)–(B).

7. *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 512 (3d Cir.1999).

appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.[8]

### i. Length of engagement.

■ 58. The Court finds that the length of this engagement is sufficient to establish an ordinary course of dealing between the parties. The Court first looks to whether the relationship was "of recent origin," as opposed to being "cemented long before the onset of insolvency." [9] "Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy." [10]

59. The parties had a limited history of dealings of only eight (8) months. The length of the parties' relationship was governed by the parties' agreement, the PSA, as extended by the parties. As set forth in the PSA, Vector agreed to provide Debtor with Mr. Lindner's professional services to allow Debtor to complete its SAS development project (Def. Ex. 1). The PSA provides for a three (3) month duration, however, that was later extended by five (5) months for a total duration of approximately eight (8) months. During this time, there were fourteen (14) payments by the Debtor, four (4) of which were made during the Preference Period (Def. Ex. 2; Pl. Ex. 6).

■ 60. Because the eight (8) month relationship between AHM and Vector is relatively short for purposes of analyzing the ordinary course of business defense, the Court must look to the industry standard to determine whether this relationship is of sufficient length to be deemed ordinary.[11] Where the parties have a relatively short history of dealings, the creditor is required to fill the "gap" by reference to a more extensive and exacting analysis of industry standards.[12]

61. Mr. Khurana testified that in his opinion, the Preference Period Checks were made within the ordinary course of his business (9/23/11 Tr. 62:10–14). Mr. Sienkiewicz also testified that the length of this contract was typical within the industry (9/23/11 Tr. 132:15–25). Mr. Sienkiewicz testified that the average length of contracts in the IT staffing industry was six (6) months (9/23/11 Tr. 186:2–5).

62. The parties' relationship was eight (8) months and was comprised completely of one project to supply the professional services of Mr. Lindner and both Mr. Khurana and Mr. Sienkiewicz testified that the length of this relationship was ordinary in the IT staffing industry. The Plaintiff has offered no opinion to contradict Mr. Khurana's or Mr. Sienkiewicz's conclusions. Therefore, based on the record before it, the Court is satisfied that Vector has met its burden of proof.

8. *See In re Archway Cookies*, 435 B.R. at 242; *see also, In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. 541, 548–49 (Bankr.D.Del. 2004).

9. *Fiber Lite Corp. v. Molded Acoustical Prods, Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 225 (3d Cir.1994).

10. *Molded Acoustical*, 18 F.3d at 225.

11. *Miller v. Westfield Steel, Inc. (In re Elrod Holdings)*, 426 B.R. 106, 111 (Bankr.D.Del. 2010).

12. *Id.* (citing *In re U.S. Interactive, Inc.*, 321 B.R. 388, 392–93 (Bankr.D.Del.2005)).

63. Both Mr. Khurana and Mr. Sienkiewicz testified that Vector is in the business of supplying professional services for computer programming projects having a duration of a few months (9/23/11 Tr. 37:14–23;39:20–24;132:15–25). If the Court were to find that this relationship was not of adequate length to be deemed ordinary, creditors in Vector's line of business would never be permitted to take advantage of the safe harbor set forth in section 547(c)(2)(A) which would have an effect to chill debtor/creditor relations of this kind. Therefore, the Court finds that Vector has carried its burden that the length of the relationship with AHM is sufficient for purposes of establish an ordinary course of dealings.

### ii. Similarity of transactions.

■ 64. Second, as stated by this Court in *In re Archway Cookies,* the Court must compare the transfers in the Historical Period to those in the Preference Period to determine if the transactions were sufficiently similar. The Court finds that they were. The amounts paid by the Debtor were consistent with the historical practices between the parties. The invoices paid by the Debtor during the Preference Period were consistent with the invoices paid during the Historical Period.

65. In determining ordinary course of dealings between the parties, however, "[c]ourts place particular importance on the timing of payment."[13] The Plaintiff relying upon the Debtor's payment records, argues that the timing of the Preference Period Checks were not sufficiently similar to the payments made during the

Historical Period. To support its argument, the Plaintiff relies on (1) the fact that the average days between invoice and clear date increased from 24.7 days during the Historical Period to 57.4 days during the Preference Period and (2) that four out of the five invoices (or 80%) paid by the Preference Period Checks were made outside of the thirty day payment terms of the PSA. When these invoices are compared to the payments made during the Historical Period when two of ten invoices (or 20%) were paid outside of the thirty day payment terms of the PSA, according to the Plaintiff, the Preference Period Checks were not ordinary.

■ 66. The Plaintiff's arguments are unpersuasive under the circumstances and unsupported by the decisions of this Court and the Third Circuit Court of Appeals. Courts have found that small deviations in the timing of payments may not be so significant as to defeat the ordinariness of such payments.[14] In contrast, courts have held greater deviations in payment timing sufficiently significant to defeat the ordinariness of such payments.[15] The PSA required thirty day payment terms. Yet, late payments do not preclude a finding that the payment occurred during the ordinary course of business; in fact a pattern of late payments can establish an ordinary course between the parties.[16]

67. As set forth in the above charts, Vector and the Plaintiff submitted records of all payments made by Debtor to Vector. The parties' application of the payments differ, but the Court finds that when analyzing the timing of payment, the receipt

13. *In re Archway Cookies,* 435 B.R. at 243 (quoting *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.),* 2009 WL 2004226, *5 (Bankr.D.Del. July 9, 2009)).

14. *Id.*

15. *Id.*

16. *In re Elrod Holdings,* 426 B.R. at 111 (citing *In re Big Wheel Holding Co.,* 223 B.R. 669, 674 (Bankr.D.Del.1998)).

date by the creditor is controlling, and not the date the Preference Period Checks "clear" as the Plaintiff suggests in its spreadsheet.[17] The Court also finds that Vector's application of the payments was reasonable and in accordance with its established procedures to applying payment to its invoices (9/23/11 Tr. 94:20–95:8).

68. Furthermore, the standard set by the Third Circuit in *Molded Acoustical Products* requires evidence only of the range of terms that encompass practices similar in a general way to the defendant's.[18] As stated by the Third Circuit, as is the case here, the "Trustee's reliance on the average payment time, as is often the case with statistics, does not portray the complete picture" of the payment history.[19] According to Vector, the Preference Period Transfers fit within the "payment after invoice" range when compared to Historical Period payments. Vector's accounting records, as supported by Mr. Khurana's testimony, establish that payments made during the Historical Period were received between 7 and 67 days after invoice. The Preference Period Checks were received between 34 and 62 days after invoice, squarely within the historic range. In *In re Elrod Holdings*, 426 B.R. at 106, the trustee brought an adversary proceeding to avoid certain transfers as preferential. Prior to the preference period, the debtor's payment history was within a range of between thirty-five (35) and seventy-three (73) days after the invoice date.[20] During the preference period, the debtor submitted payments to the defendant between thirty (30) and seventy-four (74) days after invoice.[21] Despite that the payments were made outside the range of payments from the pre-preference period, and that the defendant threatened to withhold future shipments unless the debtor made payments, Judge Gross granted the defendant's motion for summary judgment finding that the ordinary course of business exemption was applicable.[22]

69. Similarly, here, the Court finds that the evidence of the range of payments is adequate for Vector to carry its burden that the payments made during the Preference Period were similar to those made during the Historical Period. The Debtor consistently and regularly made payments to Vector in accordance with their historic course of dealings. This payment method existed for the duration of the parties relationship over the course of the SAS project. The type of payment, the type of work performed and the amounts paid were the same throughout the duration of the engagement.

70. Even using the Plaintiff's "clear date" analysis, each of the four Preference Period Checks are protected as unavoidable.

71. First, the May 25, 2007 payment of $5,440.00 was made 19 "days to pay (clear)." There is little doubt, even using

---

17. *See Barnhill v. Johnson*, 503 U.S. 393, 401–402, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (recognizing that Courts of Appeals have unanimously agreed in concluding that a "date of delivery" rule should apply to check payments for purposes of § 547(c)); *see also, Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 806–08 (5th Cir.1989) (date of transfer of a currently dated check under § 547(c)(2) is the date of delivery).

18. *The Unsecured Creditors' Committee On Behalf Of The Debtors' Estates v. CBA Indus. Inc.* (*In re Color Tile, Inc.*), 239 B.R. 872, 874 (Bankr.D.Del.1999).

19. *See Troisio v. E.B. Eddy Forest Prods., (In re Global Tissue L.L.C.)*, 106 Fed.Appx. 99, 102 (3d Cir.2004).

20. *In re Elrod Holdings*, 426 B.R. at 110.

21. *Id.*

22. *See Id.* at 110–112.

the Plaintiff's analysis that this payment is protected as ordinary.

72. Next, the May 2, 2007 payment of $12,920.00, according to the Plaintiff, paid two invoices—invoice number 23625 in the amount of $7,480.00 made 54 "days to pay (clear)" and invoice number 23577 in the amount of $5,440.00 made 69 "days to pay (clear)". The Court is satisfied that this payment is also protected as ordinary because the "days to pay" when compared to the Historical Period payments are at or near the historical range of payments.[23]

73. However, if there is any doubt as to the avoidability of $5,440.00 invoice paid by the $12,920.00 payment of May 2, 2007, as set forth below, this invoice is protected by new value extended by Vector after this payment was made.

74. Finally, with regard to the final two Preference Period Checks made on June 29, 2007 in the amount of $6,120.00 and July 3, 2007 in the amount of $5,440.00, the Court finds that based on the circumstances, the timing of each payment was sufficient to be made in the ordinary course of business.

75. Emails between the parties establish that Bonnie Singh was on extended leave when these invoices were initially sent. Ms. Singh, the contact identified on the PSA (Def. Ex. 1) and the party to whom invoices were directed, was on maternity leave and as a result payment was not timely processed (Pl. Ex. 14). There is no evidence that Vector was informed of Ms. Singh's absence prior to issuing invoices. Rather, as part of its normal collection practice, Vector only learned of Ms. Singh's absence after sending follow-up emails and making telephone calls regarding outstanding payment. Such collection practices extended to all of Vector's clients and were reasonable under the circumstances.

76. Vector's Tracey Belton sent copies of invoice numbers 23737 and 23702 on June 13, 2007 and upon approval by AHM, payments were made 22 and 26 days after Ms. Belton's email. Considering these circumstances, the June 29, 2007 payment of $6,120.00 and July 3, 2007 payments of $5,440.00 were both made within the thirty (30) day payment terms of the PSA. Based on this information, the "Preference Period Average" of "days to pay (clear)" is reduced from 57.4 days to 38 days when considering that the invoices may not have been received by AHM on the date stated in the invoice but rather received on June 12, 2007.

### iii. The Preference Period Checks were tendered in the same manner as Historical Period payments.

77. All payments were made by check both during the Historical Period and the Preference Period. The Debtor paid two (2) invoices by a single check on two separate occasions—once prior to the Preference Period and once during the Preference Period. All other payments were made by one check for one invoice (Def. Ex. 2; Pl. Ex. 6). There is no dispute over these facts.

### iv. No unusual collection activity or payment.

78. Vector took no unusual action in attempting to collect unpaid invoices. Efforts through facsimile or telephone calls may be reasonable so long as it does not "resemble a calculated response to a deteriorating creditor-debtor relationship."[24]

---

**23.** *See e.g., In re Elrod Holdings,* 426 B.R. at 110.

**24.** *In re Color Tile, Inc.,* 239 B.R. 872 at 875 (noting that fax sent to Debtor to pay past

79. Mr. Khurana testified that his employees would "politely" inquire about outstanding payments (9/23/11 Tr. 56:15–21: 102:10–25). Vector has an established procedure of meeting weekly internally to discuss outstanding invoices (i.e. invoices not paid within 30 days). Mr. Khurana then directed his employees to make contact with clients through email and telephone to inquire about the status of payment (9/23/11 Tr. 102:22–103:2). This procedure applies to all clients and was not limited to AHM during the Preference Period (9/23/11 Tr. 56:11–21).[25]

80. There is no evidence, however, that these collection practices lead to payments generated more quickly. Indeed, the emails exchanged internally by AHM indicate that it continued to follow its internal procedure of ensuring that Mr. Lindner's timesheets were approved prior to issuing payment.

### v. Vector Did Not Do Anything To Gain An Advantage In Light of Debtor's Deteriorating Financial Condition.

81. There is no evidence that Vector took advantage of the Debtor's deteriorating financial condition or that Vector was even aware that the Debtor's imminent bankruptcy. Rather, Mr. Khurana testified that Vector was unaware of the Debtor's financial conditions (9/23/11 Tr. 61:21–24), did not request additional security or collateral in exchange for payment

(9/23/11 Tr. 61:25–62:3), did not assess any late fees (9/23/11 Tr. 62:4–6) or apply pressure in exchange for payment (9/23/11 Tr. 62:7–9). There is also no indication from the AHM emails that AHM's employees had any knowledge of AHM's deteriorating financial condition, let alone, communicated these facts to Vector.

82. Based on this record, the Court is satisfied that Vector has established its ordinary course of business defense because it is clear that the four Preference Period Checks were not made in response to a zealous creditor's attempts to collect on a debt through preferential treatment ahead of other creditors, but rather an attempt by the debtor to maintain its normal business practices.

### (b) *Each of the Preference Period Transfers were made according to "ordinary business terms".*

83. Vector also met its burden to satisfy the requirements of section 547(c)(2)(B). "Ordinary business terms" looks to general norms within the creditor's industry.[26] As the Third Circuit has held, transfers may be avoided only if they are "so idiosyncratic as to fall outside that broad range" of practices customary in the creditor's industry.[27] This Court and others within the Third Circuit have frequently characterized "ordinary business terms" as embracing a "broad range" of credit practices that are "in harmony with the range of terms prevailing as some relevant

---

invoices was insufficient to make the payment preferential); *see also, In re Global Tissue,* 302 B.R. 808, 812–813 (D.Del.2003)(telephone calls by defendant were ordinary despite fact that telephone calls caused Debtor to issue check by overnight mail).

25. *Id.* at 813 (Contacting customers, including the debtor about outstanding invoices deemed acceptable normal and common business practices).

26. *See, e.g., Official Comm. of Unsecured Creditors v. Brown (In re Cherrydale Farms, Inc.),* 2001 WL 1820323 *3 (Bankr.D.Del. Feb. 20, 2001).

27. *See, e.g., In re Molded Acoustical Prods., Inc.,* 18 F.3d at 224 (quoting *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1033 (7th Cir.1994)); *Argus Mgmt. Group v. Chanin Capital Partners, LLC (In re CVEO Corp.),* 320 B.R. 258, 263 (Bankr.D.Del.2005).

industry norms." [28]   As the bankruptcy court held in *Bohm v. Golden Knitting Mills, Inc. (In re Forman Enterps., Inc.)*, 293 B.R. 848, 859, 860 (Bankr.E.D.Pa. 2003), "[o]nly dealings that are so unique as to fall outside this broad range [of industry practices] should be considered extraordinary and beyond the scope of § 547(c)(2)([B]).... Even departures from that industry's norms which are not so flagrant as to be 'unusual' lie within the protection afforded by [§ 547(c)(2)(B)]."

84. The Third Circuit is not alone in this broad interpretation of section 547(c)(2)(B). Bankruptcy courts within the Sixth Circuit characterize the inquiry as whether "the transaction was not so unusual as to render it an aberration in the relevant industry." [29]   Also, within the Eleventh Circuit, bankruptcy courts have held "[t]he focus of § 547(c)(2)([B]) should be on whether the terms between the parties were particularly unusual in the relevant industry." [30]   The Fourth Circuit, following the leads of the Third and Seventh Circuits, cited *Molded Acoustical's* holding that "even departures from that relevant industry's norms which are not so flagrant as to be 'unusual' remain

within subsection [B]'s protection." [31]   And the Fifth Circuit, in *G.H. Leidenheimer Baking Co., Ltd. v. Sharp (Matter of SGSM Acquisition Co., LLC)*, 439 F.3d 233, 239 (5th Cir.2006), held, "[s]ome latitude exists under the objective prong, as the courts should not impose a single norm for credit transactions within an industry; the inquiry is whether 'a particular arrangement is so out of line with what others do' that it cannot be said to have been made in the ordinary course."

85. Because Congress did not intend to upset commercial dealings with distressed parties, the "ordinary business terms" test of section 547(c)(2)(B) is necessarily a broad one, and the evidentiary standard is not formidable. As this Court has held, "the creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry." [32]   The creditor must simply establish a " 'range of terms' on which 'firms similar in some general way to the creditor' deal." [33]   Precise data is not necessary to prove ordinary business terms within the creditor's industry.[34]   The evidentiary standard, the *Forman* court noted, is "an 'accommodating' one." [35]

---

**28.** *See, e.g., Forklift Liquidating Trust v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (Bankr.D.Del.2006) (quoting *Molded Acoustical Prods.*, 18 F.3d at 226); *Big Wheel Holding Co. v. Federal Wholesale Co. East (In re Big Wheel Holding Co., Inc.)*, 223 B.R. 669, 674 (Bankr.D.Del.1998) (only dealings so unusual as to fall outside of broad range should be deemed extraordinary).

**29.** *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 455 (Bankr. S.D.Ohio 2004) (citing *Luper v. Columbia Gas of Ohio, Inc. (In re Carled)*, 91 F.3d 811, 818 (6th Cir.1996)).

**30.** *Graphic Prods. Corp. v. WWF Paper Corp. (In re Graphic Prods. Corp.)*, 176 B.R. 65, 72 (Bankr.S.D.Fla.1994) (citing *Jones v. United Sav. & Loan Ass'n. (In re U.S.A. Inns of Eure-*

*ka Springs, Ark., Inc.)*, 9 F.3d 680, 685–86 (8th Cir.1993)).

**31.** *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1050 (4th Cir.1994).

**32.** *In re Forklift LP Corp.*, 340 B.R. at 739.

**33.** *Id.*

**34.** *See In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. at 550 ("The analysis of § 547(c)(2)[B] in Tolona Pizza, adopted by Molded Acoustical, affords meaning to that provision, but does not render its satisfaction so exacting as to require a proponent to depend upon information which may be difficult if not impossible to obtain from its competitors within its industry.").

86. Vector's expert, Bradley Sienkiewicz, opined that Vector's dealings with the Debtor fit within the relevant industry standard.[36] While the Court provides Sienkiewicz's opinion limited weight, based on the record, the Court is satisfied that Vector has carried its burden of proof of establishing the industry standard.

87. In this case, Vector presented significant evidence concerning the payment standards in the IT staffing industry. Vector is in the business of providing professional staffing-related services and the Debtor used Vector to fill its employment needs for its SAS project. Mr. Sienkiewicz testified that he has at least two other clients that are direct competitors of Vector and is generally familiar with the payment standards of this industry. Vector's invoices and the subsequent payments are not out of the ordinary for the industry. Mr. Khurana testified that Vector's receivables payment history with the Debtor is representative of the industry at large. Upon payment, it was Vector's practice to apply the payment to the oldest invoice unless otherwise agreed expressly between the parties. The application of payment was made in accordance with Vector's policies and procedures and also the practices and procedures generally accepted within the software development and IT staffing industries. There is no evidence that Vector changed the terms it extended to the Debtor during the Preference Period.

88. Vector's expert, Bradley Sienkiewicz, opined that it is common for IT staffing companies the size of Vector to apply payments to the oldest invoices before applying payment to more recent invoices. Mr. Sienkiewicz relied upon data both based on his experience with other similar clients and external credit reports to conclude that the alleged Preference Period Checks were made in accordance with the ordinary business terms in the industry. Mr. Sienkiewicz reviewed Vector's payment history with the Debtor and the Debtor's accounts payable records in rendering his opinion. As part of the Debtor's accounts payable records he reviewed the emails exchanged between the parties (9/23/11 Tr. 155:19–156:3). He concluded that it is typical for payments to be made after the due date (here, 30 days after invoice) and compared the days after invoice date regarding payments made during the Historical Period (7 to 67 days after invoice), which is consistent with the industry standard, with the payments made during the Preference Period (34 to 62 days after invoice). In rendering his opinion, he reviewed email communication between the parties relating to re-submission of invoices based on Ms. Singh's absence from AHM and concluded that such a practice was typical under the circumstances (9/23/11 Tr. 159:13–25).

89. Mr. Sienkiewicz's opinion was not refuted by any expert opinion offered by the Plaintiff. In light of the record, the Court cannot conclude that the Preference Period Transfers were not made in accordance with the industry standard.

### New Value Defense

90. Although Defendant has a completed defense based on the ordinary course of

---

35. *In re Forman Enterps., Inc.*, 293 B.R. at 859 (citing *Molded Acoustical*, 18 F.3d at 224).

36. In considering which industry standard is applied, the "emerging legal view is that 547(c)[B] requires objective proof that the disputed payments are 'ordinary' in relation to the prevailing standards in the creditor's industry." *In re Global Tissue, L.L.C.*, 302 B.R. at 813 (quoting *Official Comm. Of Unsecured Creditors for Cherrydale Farms, Inc. v. Brown (In re Cherrydale Farms, Inc.)*, 2001 WL 1820323, *6 (Bankr.D.Del.2001)).

business, it also has a partial defense based upon section 547(c)(4) of the Bankruptcy Code. Section 547(c)(4) of the Bankruptcy Code provides that a transfer may not be avoided to the extent that "after such transfer, such creditor gave new value to or for the benefit of the debtor—(A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4).

91. Vector contends, to the extent that it does not have a complete ordinary course of business defense, it extended new value to the Debtor based upon the professional consulting services that Peter Lindner provided to the Debtor subsequent to the May 7, 2007 payment of $12,920.00. Mr. Khurana testified that the amount of "new value" extended by Vector in the form of consulting services totals $5,440.00 for services rendered by Mr. Lindner between May 7, 2007 and May 17, 2007 on or after Vector received the payment of $12,920.00. The timesheets indicate that Vector supplied and the Debtor approved Lindner's consulting services from May 7, 2007 through May 17, 2007. The value of Lindner's services rendered subsequent to payment is calculated by combining $4,080.00 (from Invoice No. 23799) and $1,360.00 (Invoice No. 23911). Based on this evidence, the Court concludes that the amount of "new value" extended by Vector in the form of consulting services of Mr. Lindner either contemporaneously with (and was intended as such) or subsequent to the Debtor's May 7, 2007 payment, therefore, Vector is entitled to new value totaling $5,440.00.

## Conclusion

92. The Defendant has satisfied its burden to prove its defenses pursuant to Section 547(c) of the Bankruptcy Code by a preponderance of the evidence as to the four Preference Period Transfers. Judgment, therefore, shall be awarded in favor of the Defendant and against the Plaintiff. The Complaint shall be dismissed with prejudice. An appropriate Order follows.